RODNEY BOSS, APPELLANT, V. FILLMORE COUNTY SCHOOL DISTRICT NO. 19, A POLITICAL SUBDIVISION OF THE STATE OF NEBRASKA, APPELLEE.

559 N.W.2d 448

Filed February 7, 1997.   No. S-94-712.

Beverly Evans Grenier, of Scudder Law Firm, P.C., for appellant.

Daniel J. Alberts, of DeMars, Gordon, Olson, Recknor & Shively, for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

WHITE, C.J.

Fillmore County School District No. 19 (district) petitioned this court for further review of the decision of the Nebraska Court of Appeals which determined that the evidence was insuf-

ficient to support a finding that superintendent Rodney Boss engaged in unprofessional conduct, incompetency, and neglect of his duties, and that Boss was entitled to periodic evaluations twice during his first year of employment and at least once annually thereafter. See *Boss v. Fillmore Cty. Sch. Dist. No. 19*, 4 Neb. App. 624, 548 N.W.2d 1 (1996). We affirm.

On July 31, 1992, Boss entered into a 3-year employment contract with the district. The contract provided that Boss could be discharged "if he materially breaches any provision of this Contract or performs any action which substantially inhibits his ability to discharge his duties, including . . . (a) incompetence . . . (f) neglect of duty, (g) general neglect of the business of the District, [or] (h) unprofessional conduct . . . ."

On July 30, 1993, Boss was notified that the school board (board) was considering cancellation of his contract due to his incompetence in managing the financial affairs of the district, his mishandling of various special education complaints such that complaints were subsequently filed against the district with the "Office of Civil Rights," and his unprofessional conduct in relation to staff, students, parents, and a board member. The alleged unprofessional conduct included violations of the district's sexual harassment policy (Policy GAAB).

On August 9, the board failed to hold a scheduled budget hearing, and consequently, Boss was without information as to certain budget items needed before completion of the budget documents for 1993-94. On Sunday, August 15, the board president gave Boss oral direction as to some of the needed information. The next day, Monday, August 16, Boss began preparation of the budget notice for publication in the local newspaper, believing he had until Wednesday to complete this task; at 10 o'clock that Monday morning, Boss was directed to have this notice completed and published by noon that day. Boss met this deadline, but the notice contained an error which required republication.

On August 17, the board placed Boss on administrative leave, refused him entry to his office until after office hours, and prohibited Boss from contacting his staff. Despite these limitations, Boss delivered completed budget documents to the board on August 20, 1993, and additional documents to the board on the

night of the budget hearing, August 23. The board did not act to adopt the budget at that hearing.

The hearing concerning the termination of Boss' contract convened on August 24 at 7:30 p.m. At this hearing, testimony was presented on several issues. Regarding errors made in the budget documents, the district's own expert, former district superintendent Don Pieper, testified that the majority of alleged errors committed by Boss occurred in draft budget documents, these errors were corrected of Boss' own accord in the finalized documents, there was only one "not real significant error" in the finalized documents, and sometimes changes had to be made in budget worksheets and draft documents. Boss testified that haste was a direct factor in the errors made in the budget documents and that he had had difficulty preparing these documents due to the board's own indecision.

Joe Reinhart, a superintendent for the neighboring Exeter school district, testified that there had been "instances when I transposed a number or something" and that at times he had difficulty understanding the instructions for preparing budget documents. One of Boss' witnesses, Marge Melroy—administrative assistant of the Phelps County superintendent of schools—stated that she regularly reviews budget documents filed by superintendents and must frequently call these superintendents and ask them to make changes on submitted documents.

Another issue involving Boss' alleged neglect of duty involved his failure to file a "Chapter 1" form on time. This failure, to which Boss admitted, cost the district $250 to $3,000, and the evidence indicated that this money would have been used to send teacher Julie Johnson to a Chapter 1 conference in Hawaii.

The hearing also involved allegations by certain parents that Boss neglected his duty by failing to address their complaints. One parent testified concerning an incident in which her child received a bruise at school. Due to Boss' failure to respond promptly or satisfactorily in this parent's opinion, she filed a complaint with the Office of Civil Rights. The parent stated that the matter was never resolved in any way by Boss. However, the record clearly indicates that Boss acted immediately to discuss the situation with the children and the parents, the parents gave

Boss only one weekend to resolve the situation to their satisfaction before filing a complaint, the issue of discipline was primarily the principal's duty and not the superintendent's, and the parents received four responses by the principal in addition to Boss' actions regarding this complaint.

This same parent also complained that she was not allowed to view telephone records at the superintendent's office after having been given permission to do so at a board meeting. The record clearly indicates that Boss was not present at the office to give the staff permission to turn those records over to the parent the day she arrived to view the records; that the principal delayed providing her with the records in order to contact the school attorney; and that once the situation was clarified, both Boss and the principal made several efforts to allow the parent to view the records, all of which efforts were rebuffed.

Finally, the board heard testimony concerning Boss' allegedly unprofessional conduct. First, board member Elizabeth Long testified that she was told that Boss had made an unflattering and undisclosed remark about her at a staff meeting. Boss denied making this statement. Long also testified that prior to hearing of the alleged statement, "[Boss had] never been rude to me, nor me to him. And that's the crux of wherein lies our problem, his and mine. Because I feel that he always minimizes my concern."

The testimony regarding Boss' alleged unprofessional conduct included a charge that Boss violated the district's sexual harassment policy, Policy GAAB. The evidence consisted of allegations that Boss on occasion touched male and female employees on the knee or shoulder when speaking with them; that on one occasion he introduced teacher Julie Johnson as "our Julie" to another administrator who also employed a teacher named Julie; that at a conference with Johnson, he told a salesclerk in a store that she was "with me"; that Boss jokingly offered to act as a male model at a lingerie party hosted by Johnson; that Boss would greet Johnson with "[H]i, Julie and how are you" when she entered the teachers' lounge; and that Boss told Johnson in the context of a budgetary request that the song "What Part of No Don't You Understand" reminded him of her.

The record unequivocally demonstrates that Johnson, the primary complainant regarding alleged violations of Policy GAAB, never verbally protested what she perceived as inappropriate conduct on Boss' part and never asked that Boss alter his behaviors prior to this action by the board. When asked by Boss' counsel, even Johnson stated, "At the time I didn't know how to take it, so yeah, it could have been [that I was misconstruing Boss' congeniality.]" The record also clearly establishes that Boss never asked Johnson for sexual favors or touched her in a sensitive location such as her breast. The record also indicates that Boss touched men and women in the same manner when speaking with them, and that most of the district's teachers and students liked and respected Boss and believed his nonverbal communication to demonstrate genuine caring and concern.

The hearing before the board lasted until approximately 7:30 a.m. on August 25, 1993, despite a motion for continuance offered by Boss at 5 a.m. At approximately 8:30 a.m., the board rendered its opinion, finding the evidence sufficient to constitute just cause to cancel Boss' contract. Boss filed a petition in error with the district court for Fillmore County, and the district court affirmed the board's finding.

The Nebraska Court of Appeals reversed, holding that the evidence was insufficient as a matter of law to support cancellation of Boss' contract due to unprofessional conduct, incompetency, or neglect of duty. The Court of Appeals noted that to cancel Boss' contract without any formal evaluations and without other evidence to support the board's finding was both arbitrary and capricious. The Court of Appeals remanded the cause with directions to enter a judgment in favor of Boss and to undertake further proceedings consistent with the court's opinion, including those necessary to address Boss' damages.

The district petitioned this court for further review, and we granted that petition. We hereby affirm the decision of the Court of Appeals.

On petition for further review and as summarized, the district alleges the following errors: (1) The Court of Appeals set forth an improper standard of review for proceedings in error from an administrative body; (2) the Court of Appeals incorrectly con-

cluded that the admitted incompetence of a superintendent from a different district, and evidence that other school district budgets had been changed due to errors, should excuse Boss' incompetence in performing budgeting duties under an erroneous construction and application of this court's decision in *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978); (3) the Court of Appeals misconstrued the evaluation obligation placed on the district by Neb. Rev. Stat. § 79-12,111 (Reissue 1994); and (4) even if notice of a deficiency is required, the Court of Appeals erred by failing to find that the board had satisfied such a requirement as to Boss by conducting evaluations and communicating deficiencies at regular board meetings.

The standard of review in a proceeding in error from an order of a school board terminating the contract of a tenured teacher is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. *Drain v. Board of Ed. of Frontier Cty.*, 244 Neb. 551, 508 N.W.2d 255 (1993); *Stephens v. Board of Ed. of Sch. Dist. No. 5*, 230 Neb. 38, 429 N.W.2d 722 (1988); *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988); *Sanders, supra*. The evidence is sufficient as a matter of law if the school board could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it. *Drain, supra*; *Nuzum, supra*; *Sanders, supra*.

The district first assigns as error that the Court of Appeals set forth an improper standard of review for proceedings in error from an administrative body. The district argues that the court must affirm the board's decision if there is some competent evidence to support the board's findings, rather than if the evidence is sufficient as a matter of law to support those findings.

We have articulated the standard of review in cases involving the termination of teacher contracts in two different ways—the first is as set forth in the Court of Appeals' decision and reiterated above; the second, as argued by the district, is whether there is some competent evidence to sustain the administrative body's findings. See *Clarke v. Board of Education*, 215 Neb. 250, 338 N.W.2d 272 (1983). This court addressed these differ-

ent articulations of the applicable standard of review in *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985). In *Eshom*, we resolved any differences in vocabulary when we stated:

> Taken together, these statements mean that we review the record in teacher termination cases to determine whether there is sufficient evidence as a matter of law to support the board's decision. . . . Stated another way, the evidence is "substantial" or "sufficient as a matter of law," or constitutes "some competent evidence," if a judge could not, were the trial to a jury, direct a verdict . . . .

219 Neb. at 471, 364 N.W.2d at 11.

We find that the Court of Appeals correctly articulated and applied the standard of review reiterated above. Neb. Rev. Stat. § 79-12,110(1) (Reissue 1994) confers upon the board the authority to cancel the contract of any certificated employee by a majority vote of its members. Thus, the board did act within its jurisdiction in this case and satisfied the first part of the applicable standard of review.

Regarding the second part of the standard of review, the evidence in this case is clearly insufficient as a matter of law to support findings of incompetency, neglect of duty, or unprofessional conduct so as to constitute just cause to terminate Boss' contract. Nebraska statutes permit the cancellation of a probationary certificated employee (which Boss is in this case) for reasons including incompetency, neglect of duty, unprofessional conduct, or reasons set forth in the employee's contract. § 79-12,110(1).

"Incompetency" is defined by the applicable Nebraska statute as "demonstrated deficiencies or shortcomings in knowledge of subject matter or . . . administrative skills." Neb. Rev. Stat. § 79-12,107(4)(a) (Reissue 1994). "Neglect of duty" is not defined in § 79-12,107(4), but our cases have noted: "Evidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination." *Sanders v. Board of Education*, 200 Neb. 282, 290, 263 N.W.2d 461, 465 (1978). "Unprofessional conduct" is

also undefined in § 79-12,107(4); however, as noted by this court in other contexts, it is clear that unprofessional conduct must be conduct directly related to Boss' fitness to act in his professional capacity. See *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 244 N.W.2d 683 (1976) (defining unprofessional conduct in context of nursing licensure act).

The board found that Boss neglected his duty as superintendent and acted incompetently with regard to the preparation of budget documents. Clearly, the record does not establish that the board could reasonably find as it did that Boss' errors on *draft* budget documents or his failure to file a single Chapter 1 funding request demonstrate shortcomings or deficiencies in knowledge or administrative skills or neglect of duty. The district's own expert, Pieper, admitted that the only error in the final budget documents presented to the board was an insignificant one. Furthermore, Melroy and Reinhart stated that errors in budget preparation often occur. As well, Boss testified that any errors that may have occurred arose because of the haste with which he had to prepare the documents due to the delay in board instruction, the fact that he was barred from entering his office during business hours, and the ban on any contact with his office personnel up to the time of the budget hearing. Despite these limitations, Boss presented a complete and final budget for the board 3 days prior to the budget hearing, and that document contained only one insignificant error.

We have stated that "evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination." *Sanders*, 200 Neb. at 290, 263 N.W.2d at 465. Boss admitted that he failed to file a Chapter 1 funding request on time; however, the evidence establishes that this failure resulted in a one-time loss of $250 to $3,000 for the district's program and that this money would have been used to send Johnson to Hawaii for a conference. The record is void of any indication that this failure on Boss' part materially harmed the district or the students in the school system in any way. We have not found, prior to this case, nor will we now find, that a superintendent's failure to file one funding form can constitute neglect of duty or unprofessional conduct sufficient to justify

terminating his contract, given the absence of any harm related to that failure.

The board also found that Boss' unprofessional conduct toward Johnson constituted a violation of district Policy GAAB and that he also conducted himself unprofessionally toward Long and some parents. Again, the record does not, as a matter of law, support this finding.

The district's Policy GAAB specifically prohibits:

> Unwelcome advances, requests for sexual favors, verbal or physical conduct of a sexual nature, submission to which is demanded by any employee of the District against any other person as a term or condition of obtaining employment . . .
>
> . . . [or] is used a [sic] basis for any employment decision . . . .
>
> [The policy also prohibits c]onduct of a sexual nature by an employee . . . directed against another employee . . . which has the purpose or effect of unreasonably interfering with work performance or creating an intimidating, hostile, or offensive working environment.

The dissent suggests that the issue of whether Boss violated the school district's sexual harassment policy in relation to Johnson is not dispositive in this case. However, the board specifically found that it was Boss' violation of this policy which constituted unprofessional conduct toward Johnson sufficient to cancel his contract. The record clearly demonstrates that Boss did not violate the district's sexual harassment policy and is devoid of any reasonable indication that Boss' conduct was sufficient to support the board's findings or the interpretation of the record advocated by the dissent.

The board found that Boss' behavior toward Johnson violated Policy GAAB. However, the record is devoid of any indication that Boss' actions were sexual in nature or created the kind of work environment Policy GAAB was designed to prevent. The record indicates that Johnson was offended by the fact that Boss greeted her when she entered the teachers' lounge; that he introduced her as "our Julie" to a fellow administrator who also employed a teacher named Julie; that he told a salesclerk that Johnson was with him when the clerk left Boss to inquire if

Johnson needed assistance; that, in the context of a budgetary request, Boss told Johnson that the song "What Part of No Don't You Understand" reminded him of her; that he jokingly offered to act as a male model at her lingerie party; and that he occasionally touched her on the knee or shoulder (as he did both men and women) when speaking with her.

The dissent states that four teachers characterized the touching of a person on the knee as "offensive or inappropriate." These characterizations are irrelevant; the question is not whether these teachers found Boss' conduct to be "offensive," but rather whether, as the board found, his conduct violated the district's sexual harassment policy so as to constitute unprofessional conduct. Clearly, the evidence is insufficient as a matter of law to support this finding.

Johnson never complained to Boss about the actions that bothered her. Boss testified that he would have altered his behavior immediately if he had known it was troublesome to Johnson. Melroy testified that when she asked Boss to not touch her when he spoke with her, he altered his behavior immediately, and continued to work well with her. Additionally, Johnson testified that Boss never made sexual advances toward her or touched her in any sensitive location and that even she did not interpret these actions as sexual. Johnson stated, "At the time I didn't know how to take it, so, yeah, it could have been [that I was misconstruing Boss' congeniality.]"

The board found that Boss' actions toward Long also constituted unprofessional conduct. Again, there is nothing in the record to reasonably support a finding that Boss' undisclosed comment about Long renders him unfit to act in his capacity as superintendent. His statement may have been insensitive, but insensitivity alone does not justify a finding of unprofessional conduct sufficient to justify termination of his contract.

The board found, as well, that Boss' conduct toward students and some parents was unprofessional. In this regard, the record demonstrates an opposite finding. No students complained of any inappropriate conduct on Boss' part; instead, teachers and parents testified that the students appreciated Boss' interest and concern for them and perceived his nonverbal communication to be simple caring. As for the complaining parents, the record

demonstrates that Boss acted promptly and professionally to address concerns and complaints; that principal Kent McLellan was the administrator responsible for any disciplinary actions; that the pertinent complaints were investigated promptly; that parents received thorough and prompt notice from either the principal or Boss after lodging any complaints; and that the confusion about allowing a parent to view the phone records was quickly clarified, but that the parent subsequently refused to examine those records.

There is a complete absence of evidence to support the board's decision in this case. The Court of Appeals accurately stated and applied the applicable standard of review in this case, and we find the district's first assignment of error to be without merit.

The district next argues that the Court of Appeals erred in construing and applying *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978), so as to evaluate Boss' conduct in comparison to what the evidence shows others charged with similar duties have done and with respect to the impact of his actions on the district. We have consistently held that "[i]ncompetency or neglect of duty are not measured in a vacuum nor against a standard of perfection, but, instead, must be measured against the standard required of others performing the same or similar duties." *Hollingsworth v. Board of Education*, 208 Neb. 350, 360-61, 303 N.W.2d 506, 512-13 (1981). Accord, *Schulz v. Board of Education*, 210 Neb. 513, 315 N.W.2d 633 (1982); *Sanders, supra.*

In *Hollingsworth*, we held that the principal's evaluation of the plaintiff teacher was suspect because the principal failed to compare the plaintiff's performance with the performance of other staff members. In *Schulz*, we found insufficient evidence to support a teacher's termination where the record was silent as to the performance of any other teachers in the school. In *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985), we upheld the termination of a teacher's contract where the evidence was sufficient to show that the teacher's performance fell below the standard of performance of other teachers in the school. In *Sanders*, we overturned the termination of a teacher's contract when the evidence indicated

that she performed her particular duties at or above the standard of performance required of other teachers performing the same or similar duties in the high school.

In the instant case, the Court of Appeals considered the testimony of the district's witness, former superintendent Pieper, who stated that he found only one insignificant error in the final budget documents submitted by Boss to the board. The Court of Appeals also considered the testimony of Melroy and Reinhart. Melroy stated that it was not uncommon for a budget document to be republished if later amended due to a school board's failure to adopt the budget. Reinhart, superintendent at Exeter, testified that he sometimes had difficulty understanding budget document directions and that he had occasionally inaccurately transposed numbers when preparing budgets.

We have consistently held that "[e]vidence that a particular duty was not competently performed on certain occasions, or evidence of an occasional neglect of some duty of performance, in itself, does not ordinarily establish incompetency or neglect of duty sufficient to constitute just cause for termination." *Sanders*, 200 Neb. at 290, 263 N.W.2d at 465. We will not measure incompetency or neglect of duty in a vacuum. The Court of Appeals correctly weighed evidence of other school district superintendents' conduct in preparation of budget documents and found that Boss' conduct in performing his budgetary duties did not fall to the level of incompetence or neglect of duty. Thus, we find that the district's second assignment of error is also without merit.

In its last two assignments of error, the district argues that the Court of Appeals misconstrued § 79-12,111(2), which mandates that a superintendent who has served under a contract with a school district for less than three successive school years "shall be evaluated twice during the first year of employment and at least once annually thereafter." In construing a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *In re Interest of Jaycox*, 250 Neb. 697, 551 N.W.2d 9 (1996); *County Cork v. Nebraska Liquor Control Comm.*, 250 Neb. 456, 550 N.W.2d 913 (1996).

The district first argues that the Court of Appeals misconstrued the statutory directive in this case, pointing to the following language:

> All probationary certificated employees . . . shall . . . be evaluated at least once each semester, unless the probationary certificated employee is a superintendent, in accordance with the procedures outlined below:
>
> . . . Should deficiencies be noted in the work performance of any probationary employee, the evaluator shall provide the teacher or administrator at the time of the observation with a list of deficiencies, a list of suggestions for improvement and assistance in overcoming the deficiencies, and followup evaluations and assistance when deficiencies remain.
>
> If the probationary certificated employee is a superintendent, he or she shall be evaluated twice during the first year of employment and at least once annually thereafter.

§ 79-12,111(2).

The district suggests that the language "unless the probationary certificated employee is a superintendent" exempts superintendents from the specific evaluation procedures in the statute. Statutory language is to be given its plain and ordinary meaning. *Rauert v. School Dist. 1-R of Hall Cty., ante* p. 135, 555 N.W.2d 763 (1996). In addition, an appellate court will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results. *Kuhlmann v. City of Omaha, ante* p. 176, 556 N.W.2d 15 (1996).

Clearly, this argument is without merit in that the specific evaluation procedures state that the evaluator shall provide the administrator with a list of deficiencies and suggestions for improvement, and the next paragraph provides that superintendents must be evaluated on a regular basis. The "exemption of superintendents" language clearly goes to the number of times the employee is to be evaluated and not to the procedures to be used in the evaluation process. To interpret the plain language of the statute in any other way would yield an absurd result.

The district also argues that the Court of Appeals' decision results in a finding that if a deficiency set forth as a ground for cancellation had not been previously disclosed to the employee

through a specified evaluation process, such deficiency must be discounted in the assessment of the sufficiency of the evidence. The district argued before this court that to require a school board of six laypeople to evaluate a superintendent with at least 6 years of postsecondary education was an inappropriate burden to place on the board. The district also suggested that the board should not have to inform the superintendent that his actions and comments to Johnson and Long were unprofessional and inappropriate, because he should be well aware of that fact. The Legislature did not see fit to include any exceptions to the evaluation requirement, and we therefore find these arguments to be without merit in the instant case.

The plain language of the statute requires that the board evaluate Boss at least twice during his first year of employment. We have held that "[a]t the very least [a tenured teacher] should be given an opportunity to take whatever action is necessary to avoid giving offense in the future." *Hollingsworth v. Board of Education*, 208 Neb. 350, 360, 303 N.W.2d 506, 512 (1981). In *Nuzum v. Board of Ed. of Sch. Dist. of Arnold*, 227 Neb. 387, 417 N.W.2d 779 (1988), we stated that a principal who had been given regular and repeated instruction from his superintendent and was provided with an oral list of deficiencies could be terminated in compliance with § 79-12,111. We also held in *Nuzum* that the evaluation does not have to be in writing, but the employee must have notice of any deficiencies and must be given the opportunity to correct those deficiencies.

In application to the instant case, the plain language of the statute requires that the board provide Boss with notice in the form of a biannual evaluation his first year of employment as to any deficiencies in his work. The record clearly reflects that no such evaluations were given and that Boss had no notice of any quarrel with his work or conduct until the July 30 letter. Boss was given no opportunity to correct any deficiencies and testified that had he known of any problems he would have immediately modified his behavior. In violation of clearly statutory directives, the board gave Boss no evaluation and no opportunity to correct deficiencies.

Additionally, we note that the district misconstrues the Court of Appeals' decision by stating that the court discounted any

deficiencies not disclosed in a regular evaluation when assessing the sufficiency of the record. Clearly, the Court of Appeals in its opinion weighed each alleged deficiency and determined that the evidence was insufficient to support a finding of just cause to terminate Boss' contract.

The district argues that Boss should have known that his conduct was inappropriate. We stated in *Nuzum* that the evaluator does not have to tell the employee specifically that failure to correct the deficiencies will lead to dismissal. Instead, "one sufficiently educated to hold a teaching certificate . . . should reasonably expect that the failure to remove a deficiency will result in the termination of employment; that, after all, is the very purpose of probationary employment." *Nuzum*, 227 Neb. at 395, 417 N.W.2d at 785.

The distinction in this case is that Boss was never evaluated or given a list of deficiencies to correct. The plain statutory language does not give the board the latitude to assume that an administrator should know certain conduct is unacceptable—the statute instead requires that the board inform the administrator of any deficiencies and give that administrator the opportunity to correct or modify his conduct.

The district argues that the board satisfied the evaluation requirement by conducting such evaluations and communicating deficiencies at regular school board meetings. There is no evidence in the record to support this statement. If such evaluations occurred, they do not appear in the record, and thus, this last assignment of error is also without merit.

Since we find that the Court of Appeals correctly stated and applied the standard of review in this case, the evidence is insufficient as a matter of law to support the board's findings, the Court of Appeals correctly construed *Sanders v. Board of Education*, 200 Neb. 282, 263 N.W.2d 461 (1978), and the board did not comply with the statutory evaluation requirement pertinent to this case, we affirm the Court of Appeals' decision reversing the trial court's judgment and remanding with directions to enter a judgment in favor of Boss and to undertake further proceedings consistent with the court's opinion, including those necessary to address Boss' damages.

AFFIRMED.

GERRARD, J., dissenting.

I respectfully dissent. The majority, citing *Drain v. Board of Ed. of Frontier Cty.*, 244 Neb. 551, 508 N.W.2d 255 (1993), correctly sets forth our standard of review in an error proceeding as the determination of whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. The evidence is "sufficient as a matter of law" if a judge could not, were the trial to a jury, direct a verdict; it is something less than the weight of the evidence and can be such as to permit the drawing of two inconsistent conclusions. *Stephens v. Board of Ed. of Sch. Dist. No. 5*, 230 Neb. 38, 429 N.W.2d 722 (1988); *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985). In order to support a board decision, the record must be such that on the basis of all the testimony and exhibits, the board could fairly and reasonably find the facts as it did. See *Eshom, supra.*

However, rather than determining whether the board "could fairly and reasonably find the facts as it did," *id.* at 471, 364 N.W.2d at 11, and reviewing the record to ascertain whether there is "sufficient evidence as a matter of law," *id.*, to support the board's decision, the majority conducts what more closely resembles a de novo review, substituting its own inferences for the legitimate findings and conclusions of the board.

After hearing and observing the testimony of 28 witnesses and reviewing 51 exhibits, the board found, among other things, that Boss had acted in an unprofessional manner by (1) touching a staff teacher, Julie Johnson, in an inappropriate manner; (2) making inappropriate comments toward Johnson; and (3) placing his arm around female students in a way that some teachers, who observed the incidents, considered unprofessional. From these and other findings, the board concluded that Boss' actions constituted a material breach of his contract with the school district and substantially interfered with Boss' ability to discharge his duties as superintendent of schools. Thus, the board canceled Boss' employment contract based, in part, on the foregoing findings and conclusions.

I particularly disagree with the majority's characterization of the evidence regarding Boss' unprofessional conduct as an occasional touching of male and female employees on the knee

or shoulder when speaking with them. The record, when reviewed in its entire context under a sufficiency of evidence standard, reveals something quite different. Johnson, a kindergarten and "Chapter 1" teacher, testified at length about her professional relationship with Boss. Johnson testified that whenever Boss was around her, he seemed to need to touch her in some way; for example, by putting his arm around her or rubbing her neck. She said she "thought maybe my body language would let him know to sort of stay away . . . ." Instead of getting the message, Johnson said, Boss "would just [laugh] in a matter of fact way." Johnson testified that Boss would come up to her while she was at the copy machine and rub her neck. Johnson said that she told Boss to get away and that Boss' conduct made her uncomfortable.

Johnson testified that she and another teacher cohosted a lingerie party and invited all the women faculty members. When Johnson went to Boss' office for some unrelated reason, Boss, on his own, brought up Johnson's upcoming party and asked whether she needed a male model for it. Boss said that when he was a football coach his "muscles . . . were this big," gesturing to his arms and thighs.

On April 15, 1993, Johnson was scheduled to attend a Chapter 1 conference in Lincoln. Boss, who administers the Chapter 1 program, initially could not attend the same conference due to a previous commitment. However, Boss' commitment required him to attend a meeting which was also in Lincoln.

Johnson did not want to travel to Lincoln with Boss. In order to avoid traveling with Boss, Johnson told him she wanted to drive to Lincoln on her own so that during the conference lunch break, she could run some errands. Johnson said that when she told Boss of her travel plans, he became visibly upset, as evidenced by the fact that his mouth started to quiver, and he began grabbing the change in his pocket. Boss overruled Johnson and requested that she ride with him to Lincoln in a school district car.

Boss' meeting was not scheduled until the afternoon, so he elected to attend the morning session of the Chapter 1 conference with Johnson. When the conference broke for lunch,

Boss dropped Johnson off at a shopping mall and promised to return by 1 p.m. so that she could attend the conference's afternoon session. Boss was 45 minutes late returning from lunch. Boss apologized and suggested that since they had already missed most of the afternoon session, it would not be worthwhile to return for what remained of the conference.

Johnson responded that they could either go back to the conference or back to Fairmont, the location of the school. Johnson testified that Boss just started laughing and suggested they go for a drink. Johnson repeated herself and said, "[E]ither the meeting or Fairmont." Boss chose to return to Fairmont.

Johnson testified that during the return trip to Fairmont, she sat as far away from Boss as she could. However, on at least five occasions, Boss reached over, grabbed her knee, and shook it. Johnson was so offended by this unwanted touching that she ended up sitting as close to the passenger door as possible, with her knees tilted toward the door away from Boss. Upon their arrival at the Fairmont school, Johnson saw another teacher, Mary Lundberg, in the hallway of the school. Lundberg testified that when she saw Johnson on this occasion, she looked white and physically ill. Johnson told Lundberg what had just happened.

Later in the school year, Boss wrote a note to Johnson suggesting that just the two of them attend a Chapter 1 conference in South Dakota. Johnson, wanting no part of another trip with Boss, showed the note to Lundberg and suggested that Johnson would write back and say that she and Lundberg "would love to go." When Johnson delivered her reply note to Boss, he objected and asked "[w]ho invited Mary." In front of two male teachers, Johnson then asked Boss if he wanted just the two of them to go away for 3 days by themselves. Johnson testified that Boss just hung his head and reluctantly said no.

Johnson testified that Boss' conduct caused her to avoid him whenever possible and interfered with her responsibilities in regard to the Chapter 1 program. Johnson answered affirmatively when asked whether she considered Boss' ongoing approaches as offensive and whether she was being provided a hostile working environment.

In addition, four teachers (two male, two female) that testified on behalf of Boss shared the opinion that touching the leg of a staff member of the opposite sex in a work setting was either offensive or inappropriate.

One other male teacher testifying on behalf of Boss related an incident wherein Boss hugged a female student in a manner that the teacher considered unprofessional.

Suffice it to say that there was more than sufficient basis to conclude that the board could fairly and reasonably find the facts as it did. It is not for this court to determine credibility of witnesses, retry issues of fact, or decide whether this court would have reached the same conclusion as the board.

As the majority notes, unprofessional conduct must be directly related to Boss' fitness to act in his professional capacity. Unprofessional conduct must also be conduct palpably below the standards of accepted professional behavior. See *Scott v. State ex rel. Board of Nursing*, 196 Neb. 681, 244 N.W.2d 683 (1976).

This is not a sexual harassment case, and the dispositive issue is not whether Boss violated the district's sexual harassment policy. The dispositive issue is whether Boss' actions were unprofessional, and, if so, did such actions interfere with Boss' ability to discharge his duties as superintendent of schools?

Boss' conduct toward Johnson was palpably below that which is expected from a school district superintendent and, without question, directly implicated Boss' fitness to act in his professional capacity. Boss, as superintendent, is charged with *administering* and *enforcing* the sexual harassment policy in the school district. In spite of this, Johnson's testimony revealed that Boss' ongoing actions and comments were offensive and provided a hostile working environment for at least one female staff member.

There was evidence, sufficient as a matter of law, to support the board's conclusion that Boss' actions toward Johnson and certain female students constituted unprofessional conduct directly related to the administration of his duties as superintendent of schools. Under the correct standard of review in this matter, a judge could not, were this matter tried to a jury, direct a verdict for Boss. *Stephens v. Board of Ed. of Sch. Dist. No. 5,*

230 Neb. 38, 429 N.W.2d 722 (1988); *Eshom v. Board of Ed. of Sch. Dist. No. 54*, 219 Neb. 467, 364 N.W.2d 7 (1985).

I would reverse the judgment of the Court of Appeals and remand the matter with directions to affirm the judgment of the district court.

CONNOLLY, J., joins in this dissent.